1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9   Kerry VanSickle,                          No. CV-18-0411-TUC-BGM

10                 Plaintiff,

11  v.                                         **ORDER**

12  Andrew M. Saul,[1]
    Acting Commissioner of Social Security,
13
                   Defendant.
14

15          Currently pending before the Court is Plaintiff's Opening Brief (Doc. 18).

16  Defendant filed his Responsive Brief ("Response") (Doc. 21), and Plaintiff filed her Reply

17  (Doc. 22).  Plaintiff brings this cause of action for review of the final decision of the

18  Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  The United States

19  Magistrate Judge has received the written consent of both parties, and presides over this

20  case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

21  **I.      BACKGROUND**

22          **A.    *Procedural History***

23          On July 8, 2014, Plaintiff protectively filed a Title II application for Social Security

24  Disability Insurance Benefits ("DIB") and a Title XVI application for Supplemental

25  Security Income ("SSI") alleging disability as of July 8, 2014 due to bipolar disorder,

26  _____

27          [1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner
    of the Social Security Administration ("SSA").  The Court will substitute the new Commissioner
28  of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil
    Procedure.  *See also* Fed. R. App. P. 43(c)(2).

anxiety, neck and back impairments, a traumatic brain injury with cognitive loss, migraines, chronic nausea, and loss of appetite/anorexia. *See* Administrative Record ("AR") at 42, 101–02, 114–15, 127–30, 144–47, 231, 253, 256, 259, 305, 344. The Social Security Administration ("SSA") denied this application on October 8, 2014. *Id.* at 42, 101–28, 164–67. On November 28, 2014, Plaintiff filed a request for reconsideration, and on April 17, 2015, SSA denied Plaintiff's application upon reconsideration. *Id.* at 42, 129–60, 168–69. On June 10, 2015, Plaintiff filed his request for hearing. *Id.* at 42, 175–76. On February 7, 2017, a hearing was held before Administrative Law Judge ("ALJ") Barry O'Melinn. *Id.* at 42, 65–100. On August 24, 2017, the ALJ issued an unfavorable decision. AR at 39–58. On October 18, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 7, 2018, review was denied. *Id.* at 1–6, 223–29. On August 16, 2018, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B. Factual History

Plaintiff was forty-five (45) years old at the time of the administrative hearing and forty-three (43) at the time of the alleged onset of her disability. AR at 27, 56, 101, 114, 127–29, 144–45, 230, 239, 253, 305, 344. Plaintiff obtained a high school diploma. *Id.* at 56, 79–80, 127–28, 144–45. Prior to her alleged disability, Plaintiff worked in retail sales, as a sales manager, and as a bartender. *Id.* at 56, 73–79, 264, 328.

#### 1. Plaintiff's Testimony

##### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that she lives with her boyfriend, and does not have any children in the home. AR at 72. Plaintiff further testified that her boyfriend drove her to the hearing, because although she has a driver's license, she does not drive. *Id.* Plaintiff described her past work experience was in Tombstone, Arizona in 2010 and included working at an art gallery as a receptionist and on the floor, then working at a clothing boutique, and lastly, as a bartender. *Id.* at 73–77. Plaintiff testified that each position lasted for approximately two (2) to three (3) months, and then she would be fired. *Id.* at 73–76. Plaintiff indicated that she had issues with chronic lateness, which she

believed contributed to her firing. *Id.* Plaintiff further described selling Arbonne skin care and cosmetics, from approximately 2008 to 2011, based out of her home. AR at 77–78. Plaintiff testified that she graduated from high school, and had a couple of months of college. *Id.* at 79–80.

Plaintiff testified that she had three (3) children, the oldest was twenty-one (21), the middle child committed suicide, and the youngest was twelve (12). *Id.* at 76. Plaintiff further testified that her youngest child lives with her father. *Id.* Plaintiff further testified that on a typical day she tries to prevent triggers and breakdowns. *Id.* at 80. Plaintiff also indicated that she does not shop for groceries, because she cannot manage the store size and noise. AR at 80. Plaintiff reported that having to leave her cart and exit the store, on more than one occasion, has made it so that she does not shop by herself anymore. *Id.* Plaintiff noted that sometimes she accompanies her boyfriend to the store, but otherwise he does it by himself. *Id.* Plaintiff also testified that aside from doing all of the grocery shopping, her boyfriend also pays all the bills, drives her everywhere, call or texts several times per day to check on her, and generally takes care of everything for her. *Id.* at 89–90.

Plaintiff testified that she has Dissociative Identity Disorder ("DID"), with eighteen (18) different personalities; however, her treatment providers "have [her] somewhere on the dissociative spectrum and they're not sure where to put [her][,] [so] [her] diagnosis still isn't complete." *Id.* at 81. Plaintiff reported that her treatment providers had "told [her] themselves that they don't have anybody in their employ who has experience in or knowledge in treating DID or dissociative disorders." AR at 81. Plaintiff testified that she first experienced her alter personalities in January 2016 after the death of her son. *Id.* Plaintiff further testified that Southeastern Arizona Behavioral Health Services ("SEABHS") provide her medication and opined that they have failed her. *Id.* Plaintiff also testified that as a result, her boyfriend pays for her to see a therapist twice per month, who she has been seeing since April or May of 2016. *Id.* at 81–82.

Plaintiff testified that in January 2013, she and her then boyfriend broke up and he left. *Id.* at 85. Plaintiff further testified that at that time she had all three (3) of her children

living with her.  AR at 85.  Plaintiff explained that after the break-up, her mental condition became such that she could not adequately care for her children, so they each went to live with their respective father.  *Id.* at 85–86.

Plaintiff testified that she had been in-patient at the psychiatric ward twice in the previous year.  *Id.* at 88.  Plaintiff confirmed that she had been in-patient in 2013 as well.  *Id.*  Plaintiff described feeling continuing deterioration while in the psychiatric ward due to the continuing noise of the air circulation system.  *Id.* at 87–88.  Plaintiff also acknowledged being aggressive with staff, but explained that her behavior did not feel like a violent outburst at the time it occurred, rather she can see that it was looking back on it.  AR at 89.  The ALJ questioned Plaintiff regarding a note by Dr. Gayle Dean after Plaintiff's son's death that stated she was "coping well now," and Plaintiff explained that Dr. Dean was her OB/GYN and beyond telling the doctor about her diagnosis, did not feel like explaining more about what was really going on with her.  *Id.* at 90–92.  Plaintiff also contemplated that it may have been because she confirmed that she was okay with going through with the exam despite previous trauma.  *Id.*

### b.  Administrative Forms

#### i.  *Function Report—Adult*

On September 4, 2014, Plaintiff completed a Function Report—Adult in this matter.  AR 282–87, 296–304.  Plaintiff reported that she lived in a house with her boyfriend.  *Id.* at 296.  Plaintiff described her medical conditions as follows:

> My Bipolar Disorder is not yet stabilized—I am still in a state of "Crisis" with erratic mood swings and instability.  My level of stress and anxiety is debilitating to the point I rarely leave my house or see friends/family.

*Id.*  Plaintiff reported that she gets very little sleep at night ranging from one and a half to two (2) hours per night to between four (4) and six (6) hours.  *Id.* at 297.  Plaintiff further reported that this insomnia results in severe fatigue causing her to sit or rest on the sofa during the day.  *Id.* at 297.  Plaintiff also reported that she provides food and water for her cat and has a cat door so that she does not have to let her out.  AR at 297.

- 4 -

Plaintiff indicated that prior to her illness she was able to own and operate her own home-based business and raise three (3) children. *Id.* Plaintiff reported that her insomnia is extreme, especially during manic episodes, and sleep medications give her little relief. *Id.* Plaintiff indicated a lack of motivation regarding her personal hygiene, in part because she loses track of time. *Id.* at 298. Plaintiff reported that she does not "feel the need to shower, but often someone tells me I need to." *Id.* Plaintiff further reported that she does not get dressed and only wears pajamas; however, she has lost so much weight that her pajamas do not fit. AR at 298. Plaintiff purchased a weekly pill box to help her remember her medication. *Id.* Plaintiff also reported that she does not cook, eating only foods that come out of a container, such as yoghurt, applesauce, crackers, or soup. *Id.* at 297–98. Plaintiff indicated that her food choices only include items that take five (5) minutes or less to prepare, suggesting that anything more and she becomes dizzy and disoriented. *Id.* at 298. Plaintiff noted that she used to cook complicated meals, but she no longer has the energy or desire to spend time in the kitchen. *Id.*

Plaintiff further reported that she occasionally does some laundry, sweeps or vacuums, and uses Clorox wipes in the bathroom. AR at 282, 299. Plaintiff also reported that she does not have a regular cleaning schedule and needs help with chores that take longer than five (5) minutes. *Id.* Plaintiff noted that she does not have the stamina to do yardwork, and goes out only to take out the garbage or check the mail. *Id.* Plaintiff reported that if she leaves the house, she rides in a car, because it is not safe for her to drive due to anxiety, dizziness, and disorientation. *Id.* Plaintiff described going to the grocery store with her boyfriend if only a couple of items are needed, but that otherwise he does all of the shopping. *Id.*

Plaintiff reported that she does not have any money to pay bills or a bank account; however she can count change or write a check. AR at 283, 300. Plaintiff indicated that prior to her illness, she was able to earn an income and pay her bills. *Id.* Plaintiff further reported that she has lost interest in all of her former hobbies, including crafts, reading, and crosswords, and explained that her vision is blurry from the Lithium she takes. *Id.* at 283,

297, 300. Plaintiff described watching Netflix occasionally, but also notes that the noise is often bothersome. *Id.* 283, 300. Plaintiff also reported that she used to be extremely active. *Id.* Plaintiff described her social interactions consisting of an occasional visit by a friend to check on her and Facebook. AR at 283, 300. Plaintiff noted that she only goes out regularly for doctor appointments and requires someone to accompany her. *Id.* Plaintiff further described that prior to her illness she was a "social butterfly." *Id.* at 284, 301.

Plaintiff reported that her illnesses affect her ability to stand, walk, talk, hear, see, remember, complete tasks, concentrate, understand, and follow instructions. *Id.* Plaintiff explained that she can only stand or walk for approximately five (5) minutes "before feeling uncomfortable," she has vision problems since taking Lithium, she is very sensitive to sound, she cannot focus, she is easily confused and forgetful, and suffers from auditory hallucinations and delusions of persecution. *Id.* at 284–85, 301–02. Plaintiff further noted that these issues also make it difficult for her to follow instructions, especially spoken, but also written. AR at 284, 301. Plaintiff listed medications included Lithium, Clonazepam, Dicyclomine, and Promethazine. *Id.* at 286, 303. Plaintiff further reported that she does not have a problem getting along with people, because she rarely sees them. *Id.* at 285, 302. Plaintiff explained that she was fired from jobs because she would be late arriving to work, being absent too many days, and getting things confused on the job. *Id.* Plaintiff noted that she does not handle stress or changes in routine well. *Id.*

Plaintiff described herself as competent and "able" prior to her illness and depicted her prior life as including being able to parent three (3) children, earn a living, pay the bills, and cook meals. AR at 286, 303. Plaintiff explained that as a result of her health deterioration, she lost her business, the custody of her children, and her current romantic relationship is in trouble. *Id.*

On February 24, 2015, Plaintiff completed a second Function Report—Adult. *Id.* at 336–43. Plaintiff again noted that she lived in a house with her boyfriend. *Id.* at 336. Plaintiff explained that her bipolar disorder and manic depression medications keep her in

a disorientated and foggy mental state and lacking in motivation, which results in very inconsistent daily functioning. *Id.* Plaintiff described her typically day as trying to get out of bed around nine (9) o'clock, sitting on the couch, watching television, eating quick and easy meals, and sometimes going for a walk. AR at 337. Plaintiff reported providing her cat food and water daily, with help from her boyfriend. *Id.* Plaintiff further reported "very bad" insomnia and requiring medication to sleep. *Id.* Plaintiff noted that she does not have problems with personal care, but sets an alarm on her telephone to remind her to attend to her personal hygiene and to take her medications. *Id.* at 338.

Plaintiff further described preparing "easy meals" that take less than five (5) minutes, but noted that she used to be able to cook full meals. *Id.* Plaintiff reported that she does the "bare minimum" in terms of housework, including laundry, dishes, sweeping, and vacuuming. AR at 338. Plaintiff estimated that she performs these activities for approximately fifteen (15) minutes every ten (10) days. *Id.* Plaintiff also reported going outside four (4) or five (5) times per week and either walks or rides in a car. *Id.* at 339. Plaintiff further noted that she lives in a rural area where there is nothing in walking distance. *Id.* Plaintiff explained that she does not drive due to side effects from Seroquel which makes her vision blurry and her depth perception impaired. *Id.*

Plaintiff reported that she shops in stores for groceries and personal items once per week for approximately forty-five (45) minutes, and that this is her only regular outing. AR at 339–40. Plaintiff confirmed that she can pay bills, count change, handle a savings account, and use a checkbook or money orders, but noted whereas she used to pay everything on time, now she is always late. *Id.* Plaintiff reported that her only hobby is watching television, which she does all day, every day. *Id.* at 340. Plaintiff further reported that her only social interaction occurs via Facebook two (2) or three (3) times per week. *Id.* Plaintiff noted that she does not go out often, and requires reminding and someone to accompany her when she does. *Id.* Plaintiff described that prior to her illnesses she loved to be around people and plan social engagements, as well as run her own business. AR at 337, 341.

Plaintiff reported that her illnesses affect her ability to hear, see, remember, complete tasks, concentrate, and understand. *Id.* at 341. Plaintiff further explained that she has hypersensitive ears; tracers, shadows, and blurred vision constantly; is frustrated very easily; and manic, racing thoughts. *Id.* Plaintiff estimated that she can walk a mile and pay attention for an hour. *Id.* Plaintiff also reported being able to follow written and spoken instructions adequately. *Id.* Plaintiff indicated that she does not have any problems getting along with people, and has not been fired from a job because of her relationships with co-workers. AR at 342. Plaintiff reported that she cannot handle stress or changes in routine well, and "live[s] in constant fear of not recovering[.]" *Id.* Plaintiff noted that she wears glasses. *Id.* Plaintiff listed her medications as including Seroquel, Lithium, and Klonopin. *Id.* at 343.

### ii. Work History Report

Plaintiff also completed a Work History Report. AR at 328–35. Plaintiff listed her prior work as a motel housekeeper, network marketer, sales cashier in an art gallery, retail sales, and bartender. *Id.* at 328. Plaintiff described the position of housekeeper as involving changing linens, cleaning bathrooms, and cleaning floors. *Id.* at 329. Plaintiff reported that while working she walked and stood for four (4) hours per day; stooped and handled, grabbed or grasped large objects for two (2) hours per day; and kneeled, crouched, and wrote, typed, or handled small objects for thirty (30) minutes per day. *Id.* Plaintiff further reported that she frequently lifted ten (10) pounds, and the heaviest weight she lifted was twenty (20) pounds. *Id.*

Plaintiff described the position of network marketer as sales of make-up and skin care products and included taking orders by phone and placing orders online. AR at 330. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, but did not require her to write, complete reports, or perform other similar duties. *Id.* Plaintiff further described the position as requiring her to walk or stand for four (4) hours per day; handle, grab, or grasp large objects for three (3) hours per day; and stoop, reach, and write, type, or handle small objects for one (1) hour

per day.  *Id.*  Plaintiff reported that she frequently lifted less than ten (10) pounds, and the heaviest weight she lifted was ten (10) pounds.  *Id.*

Plaintiff described her position first position as a cashier as involving the sale of figurines and tourist items.  *Id.* at 331.  Plaintiff reported that she stood for six (6) hours per day; walked for five (5) hours per day; handled, grabbed, or grasped large objects for three (3) hours per day; stooped and reached for two (2) hours per day; sat and wrote, typed, or handled small objects for one (1) hour per day; and crouched for thirty (30) minutes per day.  AR at 331.  Plaintiff further reported frequently lifting less than ten (10) pounds, with the heaviest weight she lifted ten (10) pounds.  *Id.*

Plaintiff described her second position as a cashier as ringing up clothing sales and giving change.  *Id.* at 332.  Plaintiff noted the use of machines, tools, or equipment in this position.  *Id.*  Plaintiff reported walking and standing for six (6) hours per day; handling, grabbing, or grasping large objects and writing, typing, or handling small objects for five (5) hours per day; and stooping and reaching for one (1) hour per day.  *Id.*  Plaintiff noted that she frequently lifted less than ten (10) pounds, and that ten (10) pounds was the heaviest weight that she lifted.  AR at 332.

Plaintiff described her position as a bartender as making and serving drinks and restocking alcohol, including cases of beer and wine.  *Id.* at 333.  Plaintiff reported walking, standing, or handling, grabbing, or grasping large objects for six (6) hours per day and stooping, reaching, and writing, typing, or handling small objects for two (2) hours per day.  *Id.*  Plaintiff further indicated that she frequently lifted ten (10) pounds, and the heaviest weight she lifted was twenty (20) pounds.  *Id.*

### iii. Disability Report—Appeal

Plaintiff had a Disability Report—Appeal completed indicating that her "[r]apid cycling mood changes have worsened, but I do not get "high" days, just varying levels of "low"—extremely, dangerously low in October."  AR at 307.  Plaintiff also reported aching pain and exhaustion.  *Id.*

A second Disability Report—Appeal reported that Plaintiff's "mental conditions

continue to hinder her ability to complete many daily activities." *Id.* at 347. It further described a worsening of Plaintiff's bipolar disorder, anxiety, and depression. *Id.* The report also references Plaintiff's physical conditions negatively impacting her daily functions. *Id.*

### iv. Disability Determination for Social Security Pain and Other Symptoms

Plaintiff had a Disability Determination for Social Security Pain and Other Symptoms completed. AR at 314–16. Plaintiff described suffering from unusual fatigue off an on her entire life and requiring naps or rest once per day. *Id.* at 314. Plaintiff further described symptoms of depression, dysphoria, fatigue, and lack of joy. *Id.* Plaintiff also indicated that neck pain and side effects of medications including consistent headaches, racing thoughts and heart wake her up at night. *Id.* Plaintiff listed her medications as Lithium, Clonazepam, Lamictal, and Seroquel, the last of these she was weaning off. *Id.* at 315. Plaintiff listed other medications that she had discontinued due to side-effects included Prozac, Wellbutrin, and Risperdal. AR at 315.

Plaintiff reported that her depression prevents her from working and keeps her isolated without a social life. *Id.* Plaintiff described anxiety with leaving her house and very low motivation due to depression. *Id.* at 316. Plaintiff further described her daily activities to include spending the majority of time on her couch, a little computer time, occasionally doing dishes, and giving her cat food and water. *Id.* Plaintiff noted that her boyfriend helps her with the cat. *Id.*

### v. Headache Questionnaire

On September 4, 2014, Plaintiff completed a Headache Questionnaire. AR at 280–81. Plaintiff reported that she began having headaches in 2010 and described having ten (10) to twelve (12) per year. *Id.* Plaintiff noted that she has not seen her doctor regarding headaches, but rather sees her chiropractor for treatment. *Id.* Plaintiff indicated that her headaches generally last between eight (8) and twenty-four (24) hours and explained that the start at the base of her skull/top of her neck and radiate around the top and sides of her

head.  *Id.*  Plaintiff stated that the headaches are sometimes triggered by high stress, but at other times there is no apparent reason for their occurrence.  *Id.* at 281.  Plaintiff further noted that when a headache comes on, "everything stops" and she goes to bed until someone can take her to the chiropractor.  AR at 281.  Plaintiff indicated that although she does not take medication for her headaches, ibuprofen and stronger pain killers do not relieve the pain.  *Id.*

On March 3, 2015, Plaintiff had a second Headache Questionnaire completed.  *Id.* at 323.  Plaintiff described her headaches as constant, and noted that they began in July of 2014.  *Id.*  Plaintiff reported that they are considered to be a side effect of Lithium, but that they were markedly worse while she was taking Seroquel.  *Id.* at 323–24.  Plaintiff indicated that the headaches last between eighteen (18) and twenty (20) hours per day, easing in the afternoon.  AR at 323.  Plaintiff further described her headaches as an all over ache, which is very persistent and affecting her eyes with blurry vision and pressure.  *Id.* Plaintiff explained that when a headache arises, they are incapacitating and require her to lay down with the lights low.  *Id.* at 324.  Plaintiff also noted that medication does not relieve their pain.  *Id.*

## 2. <u>Vocational Expert Staci Schonbrun's Testimony</u>

Ms. Staci L. Schonbrun testified as a vocational expert at the administrative hearing. AR at 42, 92–97.  The ALJ asked Ms. Schonbrun to classify Plaintiff's past work for the business that she ran out of her home regarding sales, and noted that he did not believe the other jobs had sufficient earnings or duration.  *Id.* at 93.  Ms. Schonbrun described Plaintiff's past relevant work as retail sales, Dictionary of Occupational Titles ("DOT") number 299.677-010, with a Specific Vocational Preparation ("SVP") of 2—unskilled, and an exertional level of light.  *Id.*  Upon further questioning by the ALJ, Ms. Schonbrun confirmed that the DOT did not have a job that adequately encompassed a home business such as Avon or Amway.  *Id.* at 93–94.  As such, Ms. Schonbrun also described the position of sales manager, DOT number 185.167-046, with an SVP of 7—skilled, and a light exertional level.  *Id.* at 94–95.

The ALJ asked Ms. Schonbrun to consider a hypothetical individual of Plaintiff's age, education, and work experience and without physical exertional limitation, but who could understand, carry out, and remember simple instructions; make commensurate work-related decisions; respond appropriately to supervision and co-workers in work situations; deal with routine changes in work setting; maintain concentration, persistence, and pace for up to and including two hours at a time, with normal breaks throughout a normal work day; could not be required to interact with the public; and who should only be required to have occasional interaction with co-workers. AR at 95. Ms. Schonbrun testified that such an individual would not be able to perform Plaintiff's past relevant work, primarily because of the public interaction. *Id.* Ms. Schonbrun further testified that such an individual would be able to perform other work, such as a mail clerk or mail sorter, DOT number 209.687-026, with an SVP of 2—unskilled, and light exertional level, and 138,000 jobs in the national economy. *Id.* at 95–96. Ms. Schonbrun also suggested that the hypothetical individual could work as a housekeeper, DOT number 323.687-014, with an SVP of 2—unskilled, and light exertional level, and approximately 917,000 jobs in the national economy. *Id.* Ms. Kramer's third suggestion was a laundry worker, DOT number 361.684-014, with an SVP of 2—unskilled, and medium exertional level, and approximately 917,000 jobs in the national economy. *Id.*

The ALJ inquired as to an employer's tolerance for an individual's absences in the types of jobs she listed. AR at 96. Ms. Schonbrun opined, based on her experience, that an employee is going to be absent three (3) or more times per month, they are considered to be unemployable. *Id.* The ALJ also inquired as to an employer's tolerance for an individual's off-task production before employment would be jeopardized. *Id.* Ms. Schonbrun testified that based on her experience, an employer would tolerate less than fifteen (15) percent off task, above which the individual would not be likely to maintain employment. *Id.* Ms. Schonbrun further opined, based on her experience, that an individual who engages on a frequent and ongoing basis in conduct in the work place that is disruptive of normal operations would be precluded from competitive employment. *Id.*

### 3. **Lay Witness Testimony**

#### a. **Desiree Houston-Rocha**

On September 1, 2014, Desiree Houston-Rocha, Plaintiff's friend, completed a Function Report—Adult—Third Party. AR at 275–79, 288–95. Ms. Houston-Rocha reported that she had known Plaintiff for fifteen (15) years and that they had raised their children together and spent a lot of time together. *Id.* at 288. Ms. Houston-Rocha further reported that Plaintiff lived in a house with her boyfriend, but that "he sometimes moves out for months at a time." *Id.* at 288. Ms. Houston-Rocha described Plaintiff as having declined over the previous year, noting the loss of her home-based business, and that she stays home on the couch to avoid the stress that made her condition worse. *Id.*

Ms. Houston-Rocha reported that Plaintiff had lost custody of her children during the previous year because she was unable to care for them. *Id.* at 275, 289. Ms. Houston-Rocha further reported that Plaintiff is able to feed and water her cats, but has a kitty door so that she does not have to take care of the litterbox. AR at 275, 289. Ms. Houston-Rocha noted that Plaintiff's boyfriend helps care for the animals when he is there, but that he works 24-hour shifts and sometimes moves out. *Id.* Ms. Houston-Rocha also noted that Plaintiff has terrible insomnia. *Id.* Ms. Houston-Rocha described Plaintiff as wearing pajamas daily as her clothes no longer fit due to extreme weight loss. *Id.* Ms. Houston-Rocha also reported that Plaintiff does not seem to care or notice her personal appearance and therefore her personal hygiene suffers accordingly. *Id.* at 275, 289–90. Ms. Houston-Rocha further described Plaintiff as having frequent irritable bowel syndrome ("IBS") symptoms. AR at 275, 289.

Ms. Houston-Rocha indicated that Plaintiff has help putting her medication in a weekly pill box and she sets alarms on her phones to remind her to take her medication when no one is home. *Id.* at 290. Ms. Houston-Rocha reported that Plaintiff is unable to make her own meals and usually eats prepackaged foods such as yoghurt, applesauce or crackers. *Id.* Ms. Houston-Rocha further reported that Plaintiff may heat up a can of soup or something simple once or twice per week and only makes food that takes five minutes

or less to prepare. *Id.* Ms. Rocha noted that Plaintiff had been a very good cook before her decline. *Id.* Ms. Houston-Rocha also reported that Plaintiff does very little beyond occasional laundry, seldom sweeps or vacuums, and does not do any outdoor chores. AR at 290. Ms. Houston-Rocha explained that Plaintiff does not feel well after standing or moving for more than five (5) minutes, so does these tasks approximately once per week, but otherwise her boyfriend or other friend does chores for her. *Id.* at 290–91.

Ms. Houston-Rocha reported that Plaintiff seldom goes outside, and that if she does she rides in a car but does not drive. *Id.* at 291. Ms. Houston-Rocha further reported that although Plaintiff shops in stores for groceries, she requires someone to accompany her and usually has someone else shop for her. *Id.* Ms. Houston-Rocha reported that Plaintiff cannot pay bills or handle a savings count, but can count change and use a checkbook or money order. *Id.* Ms. Houston-Rocha explained that Plaintiff has "no money to pay bills and is cognitively too forgetful to pay on time[.]" AR at 291. Ms. Houston-Rocha noted that Plaintiff's confusion regarding money "caused the demise of her home based business." *Id.* at 276, 292.

Ms. Houston-Rocha further reported that Plaintiff used to have many hobbies and interests, such as crafting, hiking, camping, and dancing, but she no longer has any interest or ability to perform those activities. *Id.* Ms. Houston-Rocha indicated that she or another friend occasionally stop by to check on Plaintiff and Plaintiff tries to stay connected via Facebook, but does not go out socially. *Id.* Ms. Houston-Rocha noted that Plaintiff only leaves the house for medical appointments, which she had approximately once per week. *Id.* Ms. Houston-Rocha also noted that Plaintiff requires someone to accompany her to these appointments. AR at 276, 292. Ms. Houston-Rocha portrayed Plaintiff as "the person that would light up a room" prior to her illness, but indicated now Plaintiff keeps to herself. *Id.* at 277, 293. Ms. Houston-Rocha explained that the result of Plaintiff's isolation is that she is able to get along with other; however, Plaintiff's relationship with her boyfriend is very strained. *Id.*

Ms. Houston-Rocha reported that Plaintiff's conditions impact her ability to stand,

walk, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, and follow instructions. *Id.* Ms. Houston-Rocha described Plaintiff as having difficulty standing or walking more than five (5) to ten (10) minutes at a time; becoming exhausted from talking; having audio hallucinations due to her bipolar disorder; blurry vision from Lithium; and issues with her memory, concentration, understanding, and following instructions. *Id.* Ms. Houston-Rocha noted that Plaintiff can follow written instructions, but is easily confused and has difficulty remembering if she has performed a task. AR at 277, 293. Ms. Houston-Rocha further noted that Plaintiff has difficulty completing tasks and can follow brief spoken instructions. *Id.*

Ms. Houston-Rocha reported that although Plaintiff is able to get along and work with others, she has been fired from every job she has held for issues such as failing to be on time, taking too many sick days, and mistakes at work. *Id.* at 278, 294. Ms. Houston-Rocha further reported that Plaintiff does not handle stress or changes in routine well and has delusions that everyone dislikes or is mad at her. *Id.* Ms. Houston-Rocha noted that Plaintiff wears glasses and takes medication for her mental illnesses. *Id.* Ms. Houston-Rocha described Plaintiff as "a bright, energetic, and very intelligent woman, especially in her manic episodes[,]" and explained that she could function during depressive periods; however, Plaintiff's condition has become more severe and limits her functioning. AR at 277–79, 293–95.

### b. Michael King

On March 3, 2015, Michael King, Plaintiff's boyfriend, completed a Function Report—Adult—Third Party. AR at 317–22. Mr. King reported that he had known Plaintiff for five (5) years and that he is with her all the time, except when he is at work. *Id.* at 317. Mr. King further reported that he and Plaintiff live in a house together. *Id.* Mr. King described Plaintiff prior to her illness as able to work, take care of the house, shop, and pay bills. *Id.* at 318. Mr. King also indicated that Plaintiff's sleep is interrupted due to her racing thoughts. *Id.*

Mr. King reported that Plaintiff does not have difficulty performing personal care;

however, she neglects to do so. AR at 318. Mr. King further noted that Plaintiff "forgets really important things like feeding animals, Dr. appts[,] taking meds[,] can't focus, OCD checklist before leaving house" and therefore needs reminders for these, as well as personal hygiene. *Id.* at 318–20, 323. Mr. King also reported that Plaintiff can make herself a sandwich, but no longer cooks meals. *Id.* at 319. Mr. King described Plaintiff's performance of house or yard work as "very little" and noted that she does chores once or twice per week, but lacks motivation. *Id.* at 319–20.

Mr. King reported that Plaintiff rides in a car when she leaves the house, as she does not drive, and cannot go out alone. *Id.* at 320. Mr. King further explained that Plaintiff finds it difficult to leave the house. AR at 320. Mr. King noted that he does all of the shopping. *Id.* at 321. Mr. King also reported that Plaintiff could count change, but can no longer pay bills, handle a savings account, or use a checkbook or money orders. *Id.* Mr. King indicated that Plaintiff used to cook, do arts and crafts, and dance, but no longer participates in any of her former hobbies. *Id.* Mr. King reported that Plaintiff only goes out to doctor appointments, despite having been able to work and be social in the past. *Id.* at 322.

### 4. **Plaintiff's Medical Records**

#### a. **Treatment records**[2]

On December 6, 2013, Plaintiff was seen at the Benson Hospital Emergency Department with depression and suicidal ideation. AR at 367–85, 531–61. Treatment records indicate that onset was due to:

> [Plaintiff] ha[ving] been under stressor's [sic] of breakup with boyfriend and supporting her children alone. She is not eating regularly and getting poor sleep. This has been on-going for 4 months. She feel [sic] "the weight and want it to go away" "to go to sleep for 2 days, 2 weeks or as long as it takes to wake up without this hurt[.]

---

[2] The Court has reviewed the entirety of Plaintiff's medical records; however, Plaintiff's arguments are limited to issues regarding Plaintiff's mental health, and more specifically bipolar disorder. *See* Opening Br. (Doc. 18). As such, the Court's summary is limited to records relevant to those issues, and generally from Plaintiff's July 8, 2014 alleged onset date forward.

*Id.* at 367, 531. Plaintiff's mental health diagnosis was noted as bipolar disorder. *Id.* Treatment records further note that Plaintiff's "[b]ehavior/mood is pleasant, depressed[;] [a]ffect is calm[;] Patient having thoughts of suicide[;] Judgement/Insight is impaired[;] [m]emory is normal[;] [d]elusions/hallucinations are not present." *Id.* at 368, 532. After further discussion of the case, a recommendation was made to transfer Plaintiff for a higher level of care. *Id.* The hospital social worker consulted with Plaintiff and assisted with contacting her children's fathers and other family to ensure that they had a place to stay while finishing their school semester and beyond. AR at 372, 536. On this same date, Plaintiff was admitted to Aurora Behavioral Health System for inpatient mental health treatment based on her suicidal ideation with a plan. *Id.* at 386–485.

On March 25, 2014, Plaintiff was seen by John Ekman, NP BHP at SouthEastern Behavioral Health Services, Inc. ("SEABH"). *Id.* at 590–92. Her continuing diagnoses included Bipolar I disorder, Anxiety disorder, and Cannabis abuse. *Id.* at 590. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic and anxious; affect was mood-congruent; insight was fair; judgment was good; she denied any risk factors; and had a medium level of perturbation. *Id.* at 591–92. NP Ekman reported that Plaintiff was "not doing very well with acute changes in mood and hypomanic symptoms." AR at 592. NP Ekman further reported that Plaintiff "has felt overwhelmed and worried and irritable." *Id.* NP Ekman additionally noted Plaintiff had insomnia, but had gained weight back that she had previously lost. *Id.* Plaintiff indicated a reluctance to start medication because she did not want to be on them forever. *Id.*

On April 12, 2014, Plaintiff was seen by Glenn Robertson, M.D. for a follow-up. *Id.* at 727–29. Treatment records discussed Plaintiff's Bipolar Disorder, and Dr. Robertson observed that it seemed medications have "done what they were supposed to do and that she did not get excessively high or low, but she felt overmedicated." AR at 728. On April

23, 2014, Plaintiff saw NP Ekman, who noted that she was "doing well with no acute changes in mood, behavior, or cognition." *Id.* at 589. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content was appropriate; perceptions were normal; mood was euthymic; affect was mood-congruent; insight was fair; judgment was fair; she denied any risk factors; and had a low level of perturbation. *Id.* at 588–89. Plaintiff still had not started using medications, but had used marijuana and caffeine. *Id.*

On May 7, 2014, Plaintiff was seen by Michael R. Gray, M.D. to discuss getting a prescription that she normally receives from Psychology. *Id.* at 517–19, 730–32, 759–60, 1191–93. Plaintiff indicated that she was going on vacation and wanted to ensure that she had "an adequate amount of diazepam to deal with episodic anxiety situations." AR at 517, 730, 1191. Plaintiff reported using 5-HTP on an as needed based to boost her serotonin. *Id.* Dr. Gray prescribed Diazepam and Valium for her anxiety. *Id.* at 518, 732, 1192–93.

On July 10, 2014, Plaintiff saw NP Ekman for an office visit. *Id.* at 584–86. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume and was coherent, but was pressured and rapid; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was anxious; affect was mood-congruent; insight was fair; judgment was fair; she denied any risk factors and her level of perturbation was medium. *Id.* at 585–86. NP Ekman noted that Plaintiff was "doing well with no acute changes in mood, behavior, or cognition." AR at 586. Plaintiff reported some hypomania, but denied manic or major depressive episodes. *Id.* Plaintiff further reported that her sleep was variable and her appetite low. *Id.* Plaintiff also informed NP Ekman that she was going to Mt. Graham for a family reunion. *Id.* NP Ekman noted that Plaintiff was scheduled to begin lithium the following Monday. *Id.* On July 17, 2014, Plaintiff saw SeanPaul R. Dorado, PA-C. *Id.* at 733–35, 761–62, 1208–10. Plaintiff reported that she was going to be starting Lithium as prescribed by NP Ekman.

AR at 733, 761, 1208. Plaintiff further reported doing extensive research on the issue of monitoring her Lithium levels and wanted to talk to PA Dorado about it. *Id.* Treatment records noted Plaintiff's "main issue is labile mood." *Id.* On July 29, 2014, Plaintiff saw NP Ekman for an office visit. *Id.* at 581–83, 803–06. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed, anxious, and elated/euphoric; affect was labile; insight was fair; judgment was poor; she denied any risk factors; and had a medium level of perturbation. *Id.* at 582–83, 804–05. NP Ekman noted that Plaintiff was "not doing well and she says she is barely holding it together." AR at 583, 805. NP Ekman observed that Plaintiff "ha[d] been feeling manic/mixed for a few months," and Plaintiff reported that the lithium had been helpful initially. *Id.* Treatment records indicated that Plaintiff was not sleeping well, and her appetite was low. *Id.*

On August 3, 2014, Plaintiff was discharged from Community Bridges. *Id.* at 1033–34. On August 12, 2014, Plaintiff saw NP Ekman for an office visit. *Id.* at 578–80, 799–802. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and tangential; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was anxious; affect was appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a low level of perturbation. AR at 579–80, 800–01. NP Ekman noted that Plaintiff was "feeling ok and [was] taking her meds." *Id.* at 580, 801. NP Ekman further noted Plaintiff's release from community bridges and her ceasing cannabis use. *Id.* Plaintiff reported feeling sluggish on Prozac which was worse when taking Risperdal. *Id.* NP Eckman remarked that Plaintiff s "remains wary and even fearful of new meds but seems comfortable with her lithium and Prozac." *Id.* Treatment records further indicated that Plaintiff was having relationship issues and she believed he was planning on leaving. AR at 580, 801. As a result, Plaintiff

was trying to prepare "by thinking [a]bout finding work and getting back on her feet." *Id.* On August 13, 2014, Plaintiff was seen by Kelly A. Favre, M.D. at Southwestern Surgery Associates regarding breast masses. *Id.* at 677–80, 1107–10. Treatment records indicate that Plaintiff "had a severe bipolar outbreak and was institutionalized." *Id.* at 677, 1107.

On September 9, 2014, Plaintiff saw NP Ekman for an office visit. *Id.* at 575–77, 795–98. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume, and was coherent, but pressured; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed, anxious, and irritable/angry; affect was appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. AR at 576–77, 796–97. NP Ekman reported that Plaintiff "continue[d] to have labile moods and [behaviors]." *Id.* at 577, 797. NP Ekman further noted that Plaintiff was having "some good days and some bad days[.]" *Id.* Treatment records indicate that Plaintiff continued to have sleeping issues and her appetite was okay if she could keep food down. *Id.* NP Ekman observed that Plaintiff had "some [suicidal ideation] thought but NO true intent or plan." *Id.* (emphasis in original).

On October 7, 2014, Plaintiff saw NP Ekman for an office visit. AR at 791–94, 837–40. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume, and was coherent, but pressured; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic; affect was mood-congruent and appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 792–93. Treatment records further indicated that Plaintiff was doing okay "but has had rapid cycling episodes since her last appt." *Id.* at 793, 839. Plaintiff reported that she "stopped taking the Prozac due to constipation and sexual dysfunction." *Id.* Plaintiff further reported that she was having intermittent sleep issues and variable appetite and energy. *Id.*

On November 5, 2014, Plaintiff saw NP Ekman for an office visit.  AR at 787–89, 833–36.  Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed and anxious; affect was mood-congruent; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation.  *Id.* at 788–89.  Treatment records further indicated that Plaintiff was doing okay, "but is now in a moderate depression which has lasted for a few weeks."  *Id.* at 789, 835.  NP Ekman noted that Plaintiff was "frustrated and disappointed in her emotional lability."  *Id.*  Plaintiff reported contemplating stopping all of her medications.  *Id.*  Plaintiff also reported trying to go out to have fun to improve her mood, continuing to have anxiety, sleeping okay with medication, and okay appetite.  AR at 789, 835.

On December 3, 2014, Plaintiff saw NP Ekman for an office visit.  *Id.* at 783–86, 829–32.  Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content was appropriate; perceptions were normal; mood was anxious and irritable/angry; affect was appropriate; insight was fair; judgment was good; she denied any risk factors; and had a medium level of perturbation.  *Id.* at 784–85, 830–31.  Plaintiff reported feeling "unchanged with ongoing depression that has been lingering for several weeks with some elevated moods, but always depressed."  *Id.* at 785, 831.  Plaintiff further reported that she continued to have hypersensitivity to sound and external stimulations and had very blunted emotions and anhedonia.  *Id.*  NP Ekman noted that Plaintiff was sleeping okay at times, but was adjusting her Klonopin dose as to not be sedated during the day.  AR at 785, 831.

On January 6, 2015, Plaintiff saw NP Ekman for an office visit.  *Id.* at 779–81, 825–28.  Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought

process was normal and logical; thought content was appropriate; perceptions were normal; mood was depressed, anxious, and irritable/angry; affect was mood-congruent and labile; insight was poor; judgment was fair; she denied any risk factors; and had a high level of perturbation. *Id.* at 780–81, 826–27. NP Ekman observed that Plaintiff "is still not doing well with ongoing depression[,] [and] . . . is starting to realize that she should have started on more medication when she was hospitalized over a year ago." *Id.* at 781, 827. Plaintiff "denie[d] any true manic symptoms but still tries to categorize her moods and emotions as 'mixed' or 'hypomanic'." *Id.* Plaintiff expressed frustration and upset during the visit and reported stopping Wellbutrin due to agitation. AR at 781, 827. On January 28, 2015, Plaintiff saw NP Ekman for an office visit. *Id.* at 775–78, 821–24. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic and anxious; affect was mood-congruent and appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 776–77, 822–23. Treatment records further indicate that Plaintiff was "doing better with improved sleep, less depressed, and mental clarity but she feels fatigued and her sleep is fractured." *Id.* at 777, 823. NP Ekman observed that Plaintiff felt "better emotionally and psychiatrically overall, but dislikes the side effects." *Id.* NP Ekman further observed that Plaintiff "continue[d] to be very analytical and worrie[d] about all aspects of her psychiatric condition and physical sensations." AR at 777, 823. On the same date, Plaintiff and her treatment team at SEABHS completed an Annual Behavioral Health Update and Review. *Id.* at 807–12. The report indicated that Plaintiff had improved over the prior three (3) months and begun going on walks, cleaning her home, reading, was more energized, and less depressed. *Id.* at 808. The report further noted that Plaintiff was "currently unemployed and when [her] moods and emotions are more stable[,] . . . will consider work." *Id.* Plaintiff's Individual Service Plan was also updated. *Id.* at 813–16.

On February 25, 2015, Plaintiff saw NP Ekman for an office visit. AR at 817–20.

Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic; affect was mood-congruent and appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 818–19. Treatment further records indicated that Plaintiff was "doing ok at times with ongoing mood swings, irritability, depression, and physical issues." *Id.* at 819. NP Ekman observed that Plaintiff "became tearful as she spoke about her long course of treatment." *Id.* NP Ekman also noted that Plaintiff had been off her Klonopin for a while, but resumed it to help her sleep, and that she was weaning off Seroquel because of the intolerable side effects. *Id.*

On March 24, 2015, Plaintiff saw NP Ekman for an office visit. AR at 863–66. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content was appropriate; perceptions were normal; mood was irritable, angry and frustrated; affect was mood-congruent; insight was fair; judgment was good; she denied any risk factors; and had a low level of perturbation. *Id.* at 864–65. Treatment records further indicated that Plaintiff was "doing better today than she was a few weeks ago." *Id.* at 865. NP Ekman observed that Plaintiff had been in a moderate depression and called the suicide hotline, but was very frustrated by them. *Id.* Plaintiff reported her numerous side effects had subsided after stopping Seroquel. *Id.* Plaintiff was noted to be sleeping well, but appetite only fair. AR at 865.

On April 22, 2015, Plaintiff was seen by NP Ekman for an office visit. *Id.* at 859–62. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions included auditory and visual hallucinations; mood was euthymic and anxious; affect was appropriate; insight was fair; judgment was fair; she denied any risk factors; and

had a medium level of perturbation. *Id.* at 860–61. Treatment records further indicated that Plaintiff was "relatively unchanged with ongoing mood changes with some depression but no mania." *Id.* at 861. Plaintiff reported irritability, frustration, and tension, as well as hopelessness. *Id.* NP Ekman observed that these feelings coincided with her depression. AR at 861. Plaintiff also reported visual and auditory hallucinations. *Id.* Plaintiff indicated that she was sleeping well on occasion. *Id.*

On May 6, 2015, Plaintiff was seen by NP Ekman for an office visit. *Id.* at 855–58. Treatment records indicated Plaintiff had some forgetfulness and mental fogginess; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content was appropriate; perceptions were normal; mood was depressed; affect was appropriate; insight was good; judgment was good; she denied any risk factors; and had a low level of perturbation. *Id.* at 856–57. Treatment records further indicated that Plaintiff was "doing ok, but feels tired daily." AR at 857. Plaintiff also reported increased sensitivity to pain levels. *Id.* NP Ekman noted that Plaintiff was "disoriented to the day of the week most days, but is not significantly bothered by this." *Id.* Plaintiff also reported sleeping okay with Klonopin. *Id.* On May 20, 2015, Plaintiff saw NP Ekman for an office visit. *Id.* at 851–54. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed; affect was mood-congruent and labile; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. AR at 852–53. Plaintiff reported "feeling very tired and exhausted for a couple of weeks." *Id.* at 853. NP Ekman noted that Plaintiff was more irritable and depressed. *Id.* Treatment records further indicated that Plaintiff "had a busy schedule lately with watching her teen daughter and another child[,] . . . [and] camping for 2 nights." *Id.* Plaintiff reported that she was "very drained for several days following some moderate activity or change in routine." *Id.*

On June 25, 2015, Plaintiff saw NP Ekman for an office visit. AR at 847–50. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal, but tired; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was indifferent; affect was mood-congruent; insight was good; judgment was good; she denied any risk factors; and had a low level of perturbation. *Id.* at 848–49. Treatment records further indicated that Plaintiff was "doing ok with no acute changes in mood, behavior, or cognition." *Id.* at 849. NP Ekman noted Plaintiff's "ongoing mood lability and some negative cognition when she is 'down[,]'" including hopelessness and suicidal ideation. *Id.* Plaintiff reported three (3) to four (4) good days followed by weeks of depression, where she feels like a "mess" most days. *Id.*

On July 17, 2015, Plaintiff saw NP Ekman for an office visit. AR at 843–46. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was anxious, irritable, and angry; affect was appropriate; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 844–45. Treatment records further indicated that Plaintiff was "not doing well with increased erratic moods." *Id.* at 845. NP Ekman noted that Plaintiff "denie[d] any full mania but is easily distracted, irritable, frustrated, and not able to sleep well." *Id.* NP Ekman further noted that Plaintiff's appetite was low. *Id.* Symptoms appeared after reducing Lithium, and increasing its dosage was discussed. AR at 845.

On October 14, 2015, Plaintiff saw NP Ekman for evaluation and management. *Id.* at 959–62. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic and anxious; affect was appropriate; insight was good; judgment was good; she denied any risk factors; and had a low level of

perturbation. *Id.* at 960–61. NP Ekman noted that Plaintiff remained "essentially unchanged with mood swings between hypomania and mild/moderate depression." *Id.* at 961. Plaintiff reported feeling life was more manageable, with a positive swing ongoing for several weeks, but indicated that she felt a depression episode is about to start. *Id.* NP Ekman discussed adjustment of her medication depending on her level of depression or anxiety. AR at 961.

On December 2, 2015, Plaintiff saw NP Ekman for evaluation and management. *Id.* at 963–66. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed; affect was mood-congruent; insight was good; judgment was good; she denied any risk factors; and had a high level of perturbation. *Id.* at 964–65. NP Ekman noted that the medical director was also present for improved care. *Id.* at 965. Plaintiff "discussed her increased depression and stress with increased use of clonazepam recently due to the sudden suicide of her son." *Id.* NP Ekman noted Plaintiff's "clear and obvious major depressive symptoms." AR at 965. NP Ekman continued Plaintiff's medications and started Latuda for depression and mood stability. *Id.* at 966. On December 15, 2015, Plaintiff was seen for an annual behavioral health review. *Id.* at 967–70, 990–91. On December 29, 2015, Plaintiff was seen by NP Ekman for evaluation and management. *Id.* at 971–74. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed; affect was mood-congruent; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 972–73. Treatment records further indicated that Plaintiff was doing fair, but had not started Latuda yet. AR at 973. NP Ekman noted that Plaintiff "remain[ed] depressed and still grieving the death of her son." *Id.* Plaintiff was further noted to not sleeping well and appetite and energy level are fair. *Id.*

On January 20, 2016, saw NP Ekman for evaluation and management. *Id.* at 978–81. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was euthymic; affect was mood-congruent; insight was fair; judgment was fair; she denied any risk factors; and had a low level of perturbation. *Id.* at 979–80. Treatment records further indicated that Plaintiff was "doing a little better than previously but she still has no motivation or drive" and admitted to anhedonia. AR at 980. Plaintiff reported that her acute grief was passing slowly. *Id.* NP Ekman continued Plaintiff's medications, indicating she should consider starting Latuda for depression and mood stability. *Id.* at 981.

On March 29, 2016, Plaintiff was seen by NP Ekman for evaluation and management. *Id.* at 982–85. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume, coherent, but pressured; thought process was normal and logical; thought content included worry and complaint; perceptions were normal; mood was depressed, anxious, and frustrated; affect was mood-congruent and labile; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 983–84. Treatment records further indicated that Plaintiff was still having "withdrawal from stopping Klonopin and has nausea daily and this is worse in the morning which can last." AR at 984. Plaintiff also reported tinnitus and muscle cramping. *Id.* Plaintiff further reported serious sleep issues. *Id.* NP Ekman noted Plaintiff was to continue lithium and Vistaril and start propranolol for physical anxiety and tinnitus. *Id.*

On April 7, 2016, Plaintiff underwent an initial evaluation at Deep Springs Counseling Services. *Id.* at 1282–83. Plaintiff presented with emotional instability and with a history of "bipolar that does not fit, sense of being DID[.]" AR at 1282. Evaluation records indicated that Plaintiff's appearance and general behavior were appropriate; her general intellectual functioning was tangential and circumstantial; and her mood and affect

were blunted and anxious. *Id.* Records further indicated that Plaintiff had poor quality sleep and decreased work performance. *Id.* at 1283. Plaintiff denied substance abuse. *Id.* Plaintiff reported "memories of abuse emerging; grief over loss of son; [and] some chaos[.]" *Id.* Plaintiff's treatment goals included "[s]elf-understanding; [s]elf-knowledge; [g]rounding skills development; [and] processing as needed." AR at 1283. On the same date, Plaintiff had her initial session with Jeffrey D. Trujillo, M.A., L.P.C. *Id.* at 1281. Treatment records indicated ruling out DID in Plaintiff's diagnosis. *Id.* Mr. Trujillo noted that Plaintiff discussed her history of high emotionality, counseling, many diagnoses, not being believed, issues around appetite, her son's recent death, and her self-diagnosis of DID. *Id.* On April 15, 2016, Plaintiff returned to Mr. Trujillo to continue her intake. *Id.* at 1280. Mr. Trujillo noted that Plaintiff discussed her history of bipolar diagnosis, ways in which she is able to communicate with alters, and described some of her system. AR at 1280. Mr. Trujillo further indicated that they explored grounding skills that Plaintiff can utilize. *Id.* Plaintiff expressed frustration with not being believed. *Id.* On April 21, 2016, Plaintiff saw Mr. Trujillo for completion of her treatment plan. *Id.* at 1279. Treatment records indicate that a discussion regarding DID and the dissociation spectrum occurred. *Id.* Plaintiff completed a Dissociative Disorders Interview Schedule ("DDIS"). AR at 1279. Plaintiff's treatment plan listed treatment methods including cognitive behavioral therapy, psychoeducation, solution focused, family systems, eye movement desensitization and reprocessing, clinical hypnosis, guided imagery, and eclectic/combined. *Id.* at 1277. Goals included self-understanding, self-knowledge, grounding skills development, and processing as needed. *Id.*

On April 29, 2016, Plaintiff was admitted to Canyon Vista Medical Center due to suicidal ideations. *Id.* at 871–905. Treatment records indicate that Plaintiff had stopped taking her lithium and Vistaril and Plaintiff expressed wanting to kill her self for several weeks. *Id.* at 883. Plaintiff "was restrained physically for approximately 15 minutes due to unable to process information running out of the room trying to hit others and staff, and significant danger to self and others." AR at 883, 893. Plaintiff also "scream[ed] and

curse[ed] at staff at top of her lungs." *Id.* at 893. On April 30, 2016, Noelle Herrier, NP evaluated Plaintiff. *Id.* at 936–39. NP Herrier observed that Plaintiff "ha[d] some reliable information; however, tends to minimize mood symptoms and has a specific view of her diagnosis." *Id.* at 936. NP Herrier further observed that Plaintiff "fe[lt] very traumatized by the mental health system and that she has been misdiagnosed and that no one believes her, and that they have nothing done [sic], but 'fill [her] full of drugs.'" *Id.* at 937. NP Herrier reported that Plaintiff was "adamant that she does not have a bipolar disorder[,]" and Plaintiff acknowledged her hypervigilance. AR at 937. NP Herrier's Mental Status Exam included that Plaintiff was alert and oriented to person, place, time and situation; anxious and angry; labile and irritable; made poor to no eye contact; her affect was mood congruent; her speech was at times rapid and loud, but otherwise normal; her though process was goal directed and organized; her attention was poor; her insight and judgment was poor to fair; and her reliability was fair. *Id.* at 938. NP Herrier noted that Plaintiff's boyfriend called the hospital and disputed that he had ended their relationship, opined that Plaintiff has bipolar disorder, and reported that she was not taking her medications and was not sleeping, as well as other concerns. *Id.* at 939. On May 1, 2016, NP Herrier assessed Plaintiff with "ongoing significant mood lability and irritability." *Id.* at 946. Treatment records indicated that Plaintiff "continue[d] to express displeasure and [sic] the fact that she is not being treated for her 'DID.'" *Id.* at 945. NP Herrier observed that Plaintiff "continue[d] to adamantly deny that she has bipolar disorder." AR at 945. Plaintiff agreed to restart her lithium. *Id.* NP Herrier informed Plaintiff that she was "a candidate for court-ordered evaluation" which agitated Plaintiff further. *Id.* NP Herrier's mental status examination included that Plaintiff was very anxious, irritable, with lability of mood, and occasional rapid and loud speech. *Id.* On May 2, 2016, Wanda Hill, DNP noted that Plaintiff continued to request "that she be placed into a treatment facility for DID." *Id.* at 947. NP Hill described that Plaintiff "reports multiple personality disorder; however it does not appear that the patient is suffering from DID[,] [i]t does appear that she has a strong personality disorder of a borderline type." AR at 947. Plaintiff agreed to start

Lamictal "to treat her borderline personality disorder and 'DID.'" *Id.* at 948.  On May 4, 2016, Plaintiff was discharged from the hospital.  *Id.* at 940–42.  Treatment records indicated that "[w]hen [Plaintiff was] asked how long she had been diagnosed with dissociative disorder, she said only recently after seeing a psychologist one time, [and] she has not had any testing to confirm this diagnosis."  *Id.* at 940.  Plaintiff's mental status examination on discharge included that she alert, oriented, clam, and cooperative; her mood and affect were euthymic; her speech was clear and goal-directed; and she displayed some gain in her insight and judgment.  *Id.* at 941.  Plaintiff was discharged with medications including Lamictal and Geodon.  AR at 941.

On May 6, 2016, Plaintiff was seen by NP Ekman for evaluation and management. *Id.* at 986–89.  Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume, coherent, but rapid and tangential; thought process was normal and logical; thought content included worry and complaint and somatic; perceptions were normal; mood was anxious, irritable, and angry; affect was mood-congruent and labile; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. *Id.* at 987–88.  Treatment records further indicated that she was post-psychiatric hospitalization.  *Id.* at 988.  Records also indicated that Plaintiff denied feeling suicidal or being a danger to herself, but that she thought one or more of her alters may have been.  *Id.* Plaintiff reported that she "continue[d] to deal with her alters and have ongoing communications with them."  AR at 988.  NP Ekman noted that Plaintiff "fully believes in her multiple personalities and makes a good case for her dissociative disorder, however she does not mention the crucial lack of time issue and unexplained events in her life."  *Id.* at 989.  NP Ekman indicated that Plaintiff was to continue her medications and try adding propranolol in the evening.  *Id.*  On the same day, Plaintiff saw Mr. Trujillo who noted her week in the psychiatric ward.  *Id.* at 1276.  Mr. Trujillo encouraged Plaintiff "to stay in communication with Psych Nurse Practitioner about all of this."  *Id.*  Mr. Trujillo further noted that Plaintiff "expressed an event that appears to be secondary dissociation of some

sort." AR at 1276. On May 16, 2016, Plaintiff had a therapy session with Mr. Trujillo. *Id.* at 1275. Treatment records indicated that Plaintiff was "struggling with staying on meds as meds leads to 'no communication with system.'" *Id.* On May 25, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1274. Mr. Trujillo reviewed the results of Plaintiff's DDIS with her. *Id.* Treatment records indicated that Mr. Trujillo had discussed the results with a psychologist, who opined Plaintiff was not DID. AR at 1274. Plaintiff remained committed to a DID diagnosis. *Id.* Plaintiff discussed medication issues, as well as her feelings that SEABHS was not responsive to her needs. *Id.* On May 29, 2016, Plaintiff returned to Mr. Trujillo for a therapy session. *Id.* at 1273. Plaintiff reported feeling suicidal, with triggers everywhere, and feeling a great deal of distress. *Id.* Treatment records indicated that Plaintiff expressed a great deal of distress, anger, confusion, crying, and fear. AR at 1273. Mr. Trujillo escorted Plaintiff to Mountain Vista Hospital Emergency Department.[3] *Id.*

On June 1, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1272. Treatment records indicated that Plaintiff discussed her "deal" with her internal system that if she did not take medication, her internal system will cooperate, remain calm, and allow Plaintiff to be more grounded. *Id.* Treatment records further indicated that Plaintiff's current diagnoses were to rule out an Unspecified Dissociative Disorder and Borderline Personality Disorder. *Id.* Plaintiff reported sleeping and eating better, as well as overall life improvement. AR at 1272. On June 8, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1271. Plaintiff "explored difficulties in leaving house, feeling overwhelmed with ordinary tasks, judged by others, invalidated." *Id.* On June 15, 2016, Plaintiff had a session with Mr. Trujillo. *Id.* at 1270. Plaintiff explored system dynamics and had insight regarding the basis of some of her feelings of anger. *Id.* On June 29, 2016, Plaintiff saw Mr. Trujillo for a session. AR at 1269. Plaintiff reported "feeling a bit ungrounded[.]" *Id.* Mr. Trujillo noted that Plaintiff explored system dynamics, including co-consciousness,

---

[3] The Court believes this record is misdated, as the events contained within it are consistent with Plaintiff's April 29, 2016 hospitalization.

anxiety, alters changing and growing, and issues of hypervigilance. *Id.* Mr. Trujillo further noted he would not recommend hypnosis until Plaintiff was more stable. *Id.*

On August 1, 2016, Plaintiff was seen by NP Ekman for evaluation and management. *Id.* at 992–95. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal in tone and volume, coherent, but rapid and tangential; thought process was normal and logical; thought content included worry and complaint and somatic; perceptions were normal; mood was depressed and anxious; affect was appropriate, but incongruent; insight was fair; judgment was fair; she denied any risk factors; and had a medium level of perturbation. AR at 993–94. Treatment records further indicated that Plaintiff "remain[ed] distressed with ongoing multiple personalities expressed by client." *Id.* at 994. Plaintiff reported having reduced or stopped some of her medications. *Id.* Plaintiff was also reported to still have a hyperactive nervous system. *Id.* NP Ekman observed that Plaintiff says "I" to reflect one of her alters "but often means all of the alters and should be saying we or us." *Id.* NP Ekman noted that Plaintiff was to discontinue Geodon, start prazosin and cyclobenzaprine and continue lithium and Vistaril. AR at 994. On August 3, 2016, Plaintiff and her boyfriend saw Mr. Trujillo for a therapy session. *Id.* at 1268. Treatment records indicated that they explored strategies for letting Plaintiff's boyfriend in with support for her. *Id.* On August 8, 2016, Plaintiff was admitted to Canyon Vista Medical Center due to suicidal ideations. *Id.* at 906–35. Plaintiff reported that "she ha[d] several personalities within her[,] . . . [and] these personalities and ones [sic] that are feeling suicidal and her [sic] causing her to be in turmoil." *Id.* at 909. Plaintiff further reported that "she ha[d] multiple personalities [and] . . . 7 out of 14 are wanting to die." AR at 921, 927. Treatment records indicate that Plaintiff's "arm has 'No Antipsychotics' written on it stating it gave her more personalities." *Id.* at 927. On August 9, 2016, Plaintiff was seen by Randy J. Brazie, M.D. who interviewed Plaintiff and noted that "[s]he appear[ed] to be a reliable historian." *Id.* at 932. Plaintiff reported "feel[ing] very hypervigilant and is not able to sleep at night, stating that even the smallest sounds will wake her up rather

abruptly[,] [and] [s]he also [found] that she is sensitive to any sort of wind or breeze on her skin." *Id.* Plaintiff reported her past medications to include Seroquel, Lamictal, Celexa, Trileptal, perphenazine, fluoxetine, mirtazapine, risperidone, olanzapine, ziprasidone, lorazepam, and aripiprazole. *Id.* at 932–33. Dr. Brazie reported the results of Plaintiff's Mental Status Examination as follows:

> The patient is a 45-year-old female who is neatly groomed and dressed in hospital attire. She is polite and cooperative with appropriate eye contact and is not evasive, guarded or withdrawn. She presents as psychomotor neutral with speech that is normal in rate, rhythm and tone. Her though form is circumstantial. She describes her mood as "mostly a bit anxious", and her affect is dysphoric. She does endorse suicidal ideation with thoughts to overdose on medication, but denies any homicidal ideation. She denies auditory or visual hallucinations, delusional thinking or ideas of reference, but does report daily flashbacks. She states that she is fully aware of all her alter personalities which she states number in total as 14. She is alert and oriented to person, place, time and situation. She demonstrates normal attention and concentration and is at least average in IQ with intact short-term, intermediate and long-term recall. The patient displays partial insight; however, her judgment appears to be impaired due to her suicidal thinking.

AR at 933. Dr. Brazie admitted Plaintiff for in-patient treatment. *Id.* at 934. On August 11, 2016, Dr. Brazie had contact with Plaintiff on the unit. *Id.* at 949–50. Dr. Brazie noted that Plaintiff continued to be hypervigilant, easily startled, and reported feeling somewhat groggy. *Id.* at 949. Dr. Brazie's mental status examination included that Plaintiff was casually dressed and groomed; friendly and cooperative with appropriate eye contact; normal speech; logical thought form; mostly anxious mood; and dysphoric affect. *Id.* Dr. Brazie's plan included increasing Plaintiff's prazosin and maintaining her trazodone and propranolol doses. AR at 949. On August 10, 2016, Plaintiff was seen by Jacqueline Dugan, DRC BHT. *Id.* at 996–99. Treatment records indicated that Plaintiff was not eating, could not care for herself, did not feel well enough to work, and felt that her anti-psychotic medication was making her suicidal. *Id.* at 997. An application was completed seeking a Serious Mental Illness ("SMI") determination for Plaintiff. *Id.* at 998, 1000–03. On August 12, 2016, Plaintiff saw Dr. Brazie and reported physical exhaustion with pain

in her bone.  *Id.* at 951–52.  Dr. Brazie reported that Plaintiff was casually dressed and groomed; polite and cooperative with appropriate eye contact; was somewhat psychomotor agitated; had slightly pressured speech; and dysphoric affect.  AR at 951.  Dr. Brazie further adjusted Plaintiff's medication.  *Id.*  On August 13, 2016, Plaintiff was seen by Constance Slay, NP.  *Id.* at 953–54.  NP Slay noted Plaintiff had slept for almost seven (7) hours the previous night.  *Id.* at 953.  Plaintiff reported that "everyone is feeling calm inside now." *Id.*  NP Slay noted that Plaintiff was dressed in hospital attire with good grooming and hygiene; appropriate eye contact; depressed mood; very dramatic affect; pressured and rapid speech; fair insight; and impaired judgment.  AR at 953.  On August 14, 2016, Plaintiff was seen by NP Slay in the group room.  *Id.* at 957–58.  NP Slay noted that Plaintiff appeared more tired and depressed.  *Id.* at 957.  Plaintiff reported that her son's 18th birthday was coming up, but he committed suicide a year previously.  *Id.*  NP Slay described Plaintiff as "tearful at times and [that she] expressed frustration about having mental illness and how this has affected her life."  *Id.*  NP Slay noted Plaintiff was dressed in hospital attire with adequate grooming and hygiene; appropriate eye contact; depressed mood; mood congruent affect; slightly pressured speech; good insight; and impaired judgment.  AR at 957.  Plaintiff reported that she did not have any suicidal ideations, but noted that "if her alters become depressed, the suicidal ideation could occur."  *Id.*  On August 15, 2016, Dr. Brazie saw Plaintiff in her room.  *Id.* at 955–56.  Plaintiff reported that she seemed to sleep the best with a combination of prazosin, clonazepam, and trazodone.  *Id.* at 955.  Dr. Brazie noted that "[o]n further clarification, the patient states that she has not actually had any episodes of derealization or depersonalization, except for rare times where she felt that she was somewhat in a dream state."  *Id.*  Dr. Brazie indicated that Plaintiff continued to struggle with severe anxiety and intermittent thought of self-harm.  AR at 955.  Dr. Brazie reported that Plaintiff was casually dressed and groomed; polite and cooperative with appropriate eye contact; mildly psychomotor elevated; slightly pressured speech; mostly anxious mood; dysphoric affect; partial insight; and somewhat impaired judgment.  *Id.*  Dr. Brazie adjusted Plaintiff's medications in attempt to increase

her sleep. *Id.* On August 16, 2016, Plaintiff was discharged from the hospital. *Id.* at 943–44. Dr. Brazie reviewed Plaintiff's hospital course and treatment and noted her condition on discharge to include anxiety and that she had slept "much better" the previous night. *Id.* at 943. Dr. Brazie's mental status examination included that Plaintiff was causally dressed and neatly groomed; polite and cooperative with appropriate eye contact; presented with psychomotor neutral with normal speech; and logical to circumstantial thought form. AR at 943. On August 17, 2016, Plaintiff was seen at Benson Hospital after falling and injuring her face. *Id.* at 1044–51. On August 22, 2016, Plaintiff participated in a treatment planning meeting. *Id.* at 1004–08. On August 22, 2016, Plaintiff was seen by Tanya Binford, NP for evaluation and management. *Id.* at 1009–12. Treatment records indicated that Plaintiff had been in the hospital and was discharged last week. *Id.* at 1011. Plaintiff reported that "some of her 'alters' were feeling suicidal and it made her feel suicidal." AR at 1011. Plaintiff also "wonder[ed] if the Vicodin she is taking for a fall is causing the 'alters' to be overmedicated, where she can't feel them." *Id.* NP Binford noted that Plaintiff would continue her lithium, prazosin, and cyclobenzaprine, requesting the cyclobenzaprine from her primary care physician. *Id.*

On September 16, 2016, Plaintiff participated in a treatment planning meeting. *Id.* at 1013–16. On September 26, 2016, Plaintiff was seen by NP Ekman for evaluation and management. *Id.* at 1017–20. Treatment records indicated Plaintiff was fully oriented; appearance was appropriate; attitude was cooperative; behavior was normal; speech was normal and coherent, but tangential; thought process was normal and logical; thought content was appropriate; perceptions were normal; mood was anxious; affect was mood-congruent; insight was fair; judgment was fair; risk factors included ideation of danger to herself/others; and had a medium level of perturbation. AR at 1018–19. Treatment records further indicated that Plaintiff did not seem to be doing worse, and perhaps slightly better with regular propranolol. *Id.* at 1019. Plaintiff reported that benzodiazepines and other psychiatric medications increase her "dissociation." *Id.* NP Ekman noted that Plaintiff was highly emotionally and neurologically charged and irritable, but presented as pleasant

calm, and cooperative. *Id.* NP Ekman further noted that Plaintiff "still speaks in diagnosis by mentioning her PTSD and DID rather than specific symptoms." *Id.* NP Ekman continued Plaintiff's current medication, although Plaintiff had mentioned the possibility of stopping all of them. AR at 1019–20.

On November 5, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1267. Treatment records indicated that Plaintiff discussed "feeling that alters are in a place of co-consciousness and report[ed] much less internal conflict." *Id.* Plaintiff also explored processing strategies. *Id.* On the same date, Plaintiff was seen at the Emergency Department at Benson Hospital due to anxiety, depression, and suicidal ideation. *Id.* at 1037–43. Treatment records indicated that Plaintiff was weaning off Lithium and was upset due to difficulties involving her SSI disability and the anniversary of her son's suicide on that date. AR at 1037. Plaintiff reported having suicidal thoughts, but denied a plan. *Id.* at 1038. On September 12, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1266. Treatment records indicated that Plaintiff explored the nature of her internal system and reported an uptick in PTSD symptoms associated with increased self-understanding. *Id.* On September 23, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1265. Treatment records indicated that Plaintiff discussed the potential use of hypnosis, but a decision to hold off was made. AR at 1265. Treatment records further indicated continued exploration of system and discussion of use of grounding to reduce suicidality and chaos. *Id.*

On October 7, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1264. Treatment records indicated that Plaintiff expressed frustration with lack of progress. *Id.* Plaintiff discussed her feelings about electroconvulsive therapy ("ECT"). *Id.* On October 21, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1263. Treatment records indicated that a new treatment plan was completed. AR at 1263. Treatment records further indicated that Plaintiff presented "more grounded and less anxious than at last session." *Id.* Treatment records also noted that Plaintiff "explored decrease in daily functionality, wondering if it will get better as she continues to heal." *Id.*

On November 11, 2016, Plaintiff saw Mr. Trujillo for a therapy session. *Id.* at 1262. Treatment records indicated that Plaintiff discussed her mood states, feeling minimized, and DID symptoms. *Id.* Treatment records further indicated that Plaintiff that Plaintiff underwent "[c]linical hypnosis on calmness, working together, being comfortable." AR at 1262. On November 15, 2016, Plaintiff reviewed her Individual Service Plan with her recovery coach. *Id.* at 1029–32.

On December 19, 2016, Plaintiff saw Mr. Trujillo for individual therapy. *Id.* at 1261. Treatment records indicated that Plaintiff discussed the previous session of hypnosis and her ability to remain grounded. *Id.* Treatment records further indicated that hypnosis was continued. *Id.* On December 30, 2016, Plaintiff saw Mr. Trujillo for an individual therapy session. AR at 1260. Treatment records indicated that boundaries for privacy regarding their work were discussed. *Id.* Treatment records further indicated that debriefing regarding Plaintiff's previous hypnosis session occurred and hypnosis was continued. *Id.*

On January 13, 2017, Plaintiff saw Mr. Trujillo for an individual therapy session. *Id.* at 1259. Treatment records indicated that Plaintiff was feeling "worn out" and frustrated with her progress. *Id.* Treatment records further indicated that Plaintiff explored her feelings surrounding the trauma that occurred in her early life and its effects. AR at 1259. On January 27, 2017, Plaintiff saw Mr. Trujillo for therapy. *Id.* at 1258. Plaintiff reported feeling "erratic" and found it discouraging. *Id.* Treatment records indicated that exploration of Plaintiff's internal self, as well as PTSD symptoms, occurred. *Id.*

On February 1, 2017, Mr. Trujillo completed a Medical Assessment of the Patient's Ability to Perform Work Related Activity. *Id.* at 1244–45, 1254–55. Mr. Trujillo estimated the degree of impairment of the Plaintiff's ability to relate to other people as severe. AR at 1244, 1254. Mr. Trujillo further estimated the degree of restriction of Plaintiff's daily activities as severe. *Id.* Mr. Trujillo opined that the degree of deterioration in personal habits of the Plaintiff was moderately severe. *Id.* Mr. Trujillo further opined that the degree of constriction of interests of the Plaintiff was severe. *Id.* Mr. Trujillo

opined that the limitations on Plaintiff's ability to respond to customary work pressures were severe; to understand, carry out, and remember instructions, respond appropriate to supervision, respond appropriately to co-workers, perform complex tasks, and perform varied tasks were moderately severe; and perform simple or repetitive tasks were moderate. *Id.* at 1244–45, 1254–55. Mr. Trujillo also opined that limitations on Plaintiff's ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods were severe. AR at 1245, 1255. Mr. Trujillo opined that Plaintiff's limitations lasted our could be expected to last for at least twelve (12) months. *Id.* On February 3, 2017, Plaintiff saw Mr. Trujillo for an individual therapy session. *Id.* at 1257. Treatment records indicated there was a system check-in regarding the trajectory of treatment and the suggestion that such work is non-linear and difficult to predict. *Id.* Treatment records further indicated a discussion regarding disability paperwork took place. *Id.* On February 4, 2017, Mr. Trujillo opined that Plaintiff had been working diligently on her mental health issues, although progress was very slow. AR at 1256. Mr. Trujillo further reported Plaintiff's diagnoses as either Unspecified Dissociative Disorder or Post Traumatic Stress Disorder with Dissociative Features, with each diagnosis partially describing Plaintiff's symptoms. *Id.*

### b. Examining physician

On January 23, 2017, Holly Cunningham, Psy.D., in conjunction with Marion Baker, Psy.D., examined Plaintiff at the request of Hanna Kading of SEABHS. AR at 1285–1300. Dr. Cunningham observed Plaintiff to be casually dressed with appropriate hygiene; her eye contact was consistent and appropriate; her affect was broad and changed appropriately; she was oriented to person, place, and situation; and she appeared anxious, friendly, and cooperative. *Id.* at 1285. Plaintiff denied suicidal or homicidal ideation, plan, or intent, and noted the last time she had suicidal ideation was August 2016. *Id.* Through a clinical interview, Plaintiff provided Dr. Cunningham her history beginning with the childhood trauma she suffered through to the present. *Id.* at 1286–90. Dr. Cunningham

administered the Millon Clinical Multiaxial Inventory-IV ("MCMI-IV") to Plaintiff. *Id.* at 1290. Dr. Cunningham reported the results suggested that Plaintiff's "response style may indicate she reported more psychological symptoms than objectively exist and adjustments correcting for this tendency were probably successful in retaining the validity of the profile." *Id.* at 1290. Dr. Cunningham further reported that Plaintiff's results suggested "it may be assumed she is experiencing a severe mental disorder and further professional observation and inpatient care may be appropriate." *Id.* Dr. Cunningham provided detailed information regarding Plaintiff's clinical profile, trauma-related symptoms, and personality profile. AR at 1291–92. Dr. Cunningham observed that "[i]t is not unlikely that the client will attempt to appear calm and aloof on the surface, if not pleasant, despite her underlying tension and emotional dysphoria." *Id.* at 1292. Dr. Cunningham outlined treatment challenges and approaches for therapists that may be treating Plaintiff. *Id.* at 1292–94. Dr. Cunningham warned against viewing early therapeutic successes as indicators for straightforward and rapid progress in the future. AR at 1294.

Dr. Cunningham also administered the Trauma Symptom Inventory-II ("TSI-2") to Plaintiff. *Id.* at 1294–95. Dr. Cunningham described the TSI-2 as "a self-report instrument designed as a broad-spectrum assessment of trauma-related symptoms and behaviors in adults." *Id.* at 1294. Dr. Cunningham reported that Plaintiff's "[r]esults suggest[ed] problematic and clinically significant elevations in all factor scales and most individual clinical scales." *Id.* Dr. Cunningham further reported Plaintiff's endorsement of several symptoms related to anxiety, trauma, and issues thought to arise from early relational losses and/or parental maltreatment or unavailability. *Id.* at 1294–95. Dr. Cunningham provided detailed explanations regarding the findings and how such issues express themselves through Plaintiff's behaviors or how they may otherwise impact or affect her life. AR at 1295.

Dr. Cunningham also administered the Trauma and Attachment Belief Scale ("TABS"), "a self-report assessment designed to measure cognitive schemas and beliefs related to areas that are sensitive to the effects of traumatic experiences for individuals ages

9 years and up." *Id.* at 1295.    Dr. Cunningham reported that Plaintiff "responded to all items and results indicate that the profile is valid." *Id.*  Dr. Cunningham further reported that Plaintiff's results suggested that her "overall level of disruption in areas that are important to maintaining healthy relationships was in the very high range." *Id.*  Dr. Cunningham analyzed Plaintiff's results and noted the suggestion of very high disruption with regard to self-safety and self-esteem, and substantial disruption with regard to self-trust, other-intimacy, and self-control.  *Id.* at 1296–97.  Dr. Cunningham provided details regarding how these findings may express themselves in Plaintiff's life.  AR at 1296–97.

Dr. Cunningham also administered the Clinical Assessment of Depression ("CAD") to Plaintiff.  *Id.* at 1297.  Dr. Cunningham described the CAD as "a self-report instrument designed as a comprehensive assessment for the objective evaluation of depressive symptoms in children, adolescents, and adults ages 9–79." *Id.*  Dr. Cunningham reported that Plaintiff "responded to all times and results indicate[d] that the [Plaintiff] may have approached the test in a way that in a way that over endorsed symptoms, may reflect very high levels of distress, and responded to the profile in a negative manner." *Id.*  Dr. Cunningham described Plaintiff's results, explained their significance, as well as how the symptoms may express themselves in Plaintiff's life.  *Id.* at 1297–98.  Dr. Cunningham noted that the results suggested that Plaintiff was at a "very significant clinical risk for developing depression."  AR at 1297.

Dr. Cunningham administered the Multidimensional Anxiety Questionnaire ("MAQ") to Plaintiff.  *Id.* at 1298.  Dr. Cunningham described the questionnaire as "a self-report instrument designed as a comprehensive assessment for the objective evaluation of anxiety symptoms in adults." *Id.*  Dr. Cunningham reported that Plaintiff "responded to all items and results indicate that the [Plaintiff] responded in a manner that suggest[ed] very high levels of distress.  *Id.*  Dr. Cunningham further reported  that Plaintiff's results suggested symptoms related to panic and/or agoraphobia, social phobia, worries and fears, and negative affectivity.  *Id.*  Dr. Cunningham also explained the various symptoms affiliated with each category.  AR at 1298.  Dr. Cunningham's diagnosis included

Posttraumatic Stress Disorder, with dissociative symptoms. *Id.*

Dr. Cunningham observed that Plaintiff "appear[ed] to meet criteria for the diagnoses listed above as evidenced by depressive, anxious, and trauma-related symptoms as well as mood swings and disturbances in reality." *Id.* at 1298–99. Dr. Cunningham further observed that Plaintiff "appear[ed] to experience moderate to severe symptoms and moderate to severe difficulty in social and occupational functioning." *Id.* Dr. Cunningham made several treatment recommendations reflecting Plaintiff's specific needs. *Id.* at 1299–1300. Dr. Cunningham observed that Plaintiff "is not currently functioning at a level that she would be successful in obtaining and maintaining gainful employment." AR at 1299.

### c. Reviewing physicians

#### i. Eugene Campbell, Ph.D.

On October 7, 2014, Eugene Campbell, Ph.D. reviewed Plaintiff's medical records for the initial determination and provided a mental residual functional capacity assessment. AR at 122–23. Dr. Campbell opined that Plaintiff did not have understanding and memory limitations. *Id.* at 123. Dr. Campbell further opined that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple, work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Dr. Campbell also opined that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id.* Dr. Campbell concluded that Plaintiff could "meet the expectations of full time employment doing basic work tasks." *Id.*

#### ii. Paul Cherry, Ph.D.

On April 14, 2015, Paul Cherry, Ph.D. reviewed Plaintiff's medical records for a determination on reconsideration and provided a mental residual functional capacity

assessment. AR at 139–41. Dr. Cherry opined that Plaintiff did not have understanding and memory limitations, but did have sustained concentration and persistence limitations. *Id.* at 140. Dr. Cherry further opined that Plaintiff was not significantly limited in the ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Dr. Cherry also opined that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id.* Dr. Cherry opined that Plaintiff did not have social interaction or adaptation limitations. *Id.* Dr. Cherry concluded that Plaintiff could meet the expectations of full time employment doing simple work tasks. AR at 140.

### d. Records produced to the Appeals Council

On September 22, 2017, Plaintiff had a teleconference with Jody Watson from SEABHS regarding Plaintiff's concerns with her current housing situation. AR at 37–38. Plaintiff was given information for the housing specialist. *Id.* at 35. On September 29, 2017, Plaintiff had a teleconference with NP Ekman. *Id.* at 35–36. On October 19, 2017, Plaintiff had a teleconference follow-up with NP Ekman. *Id.* at 30–34. Plaintiff reported a worsening of symptoms, functioning as extremely difficult, and feeling suicidal. *Id.* at 30, 32. Plaintiff yelled and cursed out NP Ekman because he did not diagnose her "DID" or "MPI." AR at 32. NP Ekman noted that Plaintiff blamed him for the outcome of her SSDI application. *Id.* Plaintiff was also angry because her boyfriend was unfaithful and she is afraid. *Id.* NP Ekman commented that the therapeutic relationship may be damaged beyond repair. *Id.* On October 20, 2017, Plaintiff had a teleconference with Jacqueline Dugan at SEABHS. *Id.* at 26–27. Plaintiff reported difficulty sleeping even while taking Ambien. AR at 26–27. Plaintiff was encouraged to give Ambien time to work. *Id.* at 27.

A peer support wellness check was performed by Frank Alvarado on the same date. *Id.* at 24–25. Mr. Alvarado reported that Plaintiff appeared in a troubled mood and described not being able to eat or sleep. *Id.* at 24. Later in the day, Plaintiff again spoke with Jacqueline Dugan and informed her of the negative symptoms Plaintiff was suffering. *Id.* at 22–23. Plaintiff did not like any of the suggestions made by Ms. Dugan and hung up the telephone. AR at 22–23. On October 25, 2017, Plaintiff had a teleconference with Connie Charles at SEABHS. *Id.* at 20–21. Plaintiff had been seeking a therapy referral and was informed that SEABHS had recently hired a therapist that specialized in trauma, and that Plaintiff was on the list for an appointment once the therapist started working. *Id.* at 21.

On November 1, 2017, Plaintiff contacted SEABHS to request a prescription for medication to help her sleep. *Id.* at 18–19. On November 14, 2017, Plaintiff had a teleconference with Ms. Charles at SEABHS. *Id.* at 16–17. Plaintiff reported that she was scheduled for appointments with the new therapist and prescriber. AR at 16. On November 21, 2017, Plaintiff was involved in an onsite meeting regarding the coordination of her services. *Id.* at 13–15. Plaintiff reported continued lack of sleep, feeling "worn out," food issues limiting food choice, and unhappiness regarding home life. *Id.* at 14. Modifications were made to Plaintiff's medications. *Id.*

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

Where "the evidence can support either outcome, the court may not substitute its judgment

for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

Moreover, the court may not focus on an isolated piece of supporting evidence, rather it

must consider the entirety of the record weighing both evidence that supports as well as

that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations

omitted).

## III.    ANALYSIS

### A.    *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess

whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as

follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the

claimant is not disabled; step two considers if the claimant has a "severe medically

determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step

three determines whether the claimant's impairments or combination thereof meet or equal

an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not

disabled; step four considers the claimant's residual functional capacity and past relevant

work.  If claimant can still do past relevant work, then he or she is not disabled; step five

assesses the claimant's residual functional capacity, age, education, and work experience.

If it is determined that the claimant can make an adjust6ment to other work, then he or she

is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements

of the Social Security Act through December 31, 2018, and had not engaged in substantial

gainful activity since her alleged onset date of July 8, 2014.  AR at 44.  At step two of the

sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: Mental impairments variously diagnosed to include bipolar disorder, unspecified dissociative disorder, post-traumatic stress disorder (PTSD) with dissociative features, anxiety, depression, and cannabis abuse. (20 CFR 404.1520(c) and 416.920(c))." *Id.* The ALJ indicated that "[t]he claimant also has the following nonsevere impairments: spinal impairments, traumatic brain injury with cognitive loss, migraines, nausea, [and] loss of appetite/anorexia." *Id.* at 45. The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.* at 46. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant can understand, carry out, and remember simple instructions and make commensurate work related decisions, respond appropriately to supervision, coworkers and work situations, deal with routine changes in work setting, maintain concentration, persistence and pace for up to and including 2 hours at a time with normal breaks throughout the work day[;] [t]he claimant can have not interaction with the public but can be around co-workers throughout the day, but with only occasional interaction with co-workers." *Id.* at 47. At step four, the ALJ found that "[t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)." AR at 56. At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." *Id.* Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 57.

Plaintiff asserts that the ALJ erred in failing to account for the limiting effects of Plaintiff's Bipolar Disorder, as well as failed to articulate clear and convincing reasons to discount Plaintiff's credibility. *See* Opening Br. (Doc. 18). Plaintiff further asserts that

the ALJ gave inappropriate weight to the examining source opinion of Drs. Cunningham and Baker and treating counselor Jeffrey Trujillo.  *See id.*

### B.    *Plaintiff's Symptoms*

#### 1. Legal standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard."  *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required

in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 48. The ALJ then found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 54. The ALJ found that "[t]he medical evidence of record is not consistent with the claimant's allegations of severity[,] [and] . . . with respect to the period at issue, the record indicates that her alleged onset date through mid-2016, the claimant appeared to effectively manage and treat her mental symptoms." *Id.* at 49. The ALJ reviewed Plaintiff's medical records often focusing on her mental status examinations or appointments where she noted sleeping well or okay. *Id.* The ALJ further noted that he found "it significant that [Plaintiff] reported engaging in activities inconsistent with allegations of severity." *Id.* at 50. As examples, the ALJ pointed to Plaintiff going to attend a family reunion, going out to have fun to help with her depression one time, and meeting with her treatment team for an annual behavioral health review. AR at 50. Despite reviewing periods during which Plaintiff was hospitalized for suicidal ideations, the ALJ does not appear to give them much weight. *Id.* at 51–52. The ALJ also took issue with Plaintiff's belief that she has DID. *Id.* at 52. The ALJ found that Plaintiff's treatment plan that included a contemplation of returning to work was evidence that "her symptoms and limitations were not as severe as alleged." *Id.* at 52–53.

#### a. Symptom severity

The ALJ noted that Plaintiff's "long-time provider, John Ekman NP, documented near normal findings" at her appointments, and further noted that "[i]n fact, at some appointments Mr. Ekman documented that the claimant's mood was euthymic." AR at 49 (citations omitted). Regarding this latter claim, the ALJ points to three records, one from October 2014, one from January 2015, and one from February 2015. *See id.*

The October 7, 2014 record also indicated that Plaintiff reported having had "rapid

- 47 -

cycling episodes since her last [appointment,]" had stopped taking Prozac, was having intermittent sleep issues, and variable appetite and energy." *Id.* at 793, 839. Moreover, at her September 9, 2014 appointment with NP Ekman, treatment records indicate that Plaintiff continued to have labile moods and behaviors and some suicidal ideation. *Id.* at 577, 797. Then at Plaintiff's November 4, 2014 appointment, Plaintiff was "now in a moderate depression which has lasted a few weeks." *Id.* at 789, 835. The January 28, 2015 record from NP Ekman noted that Plaintiff's mood was Euthymic **and Anxious**. AR at 776–77, 822–23 (emphasis added). The record further indicated that Plaintiff did not like the side effects of her medications. *Id.* at 777, 823. Furthermore, Plaintiff had been suffering a weeks-long depressive episode the previous two (2) months. *Id.* at 785, 789, 831, 835. The February 25, 2015 record relied on by the ALJ noted that Plaintiff continued to suffer "ongoing mood swings, irritability, depression, and physical issues." *Id.* at 819. Moreover, NP Ekman further noted that Plaintiff "became tearful as she spoke about her long course of treatment" and that she had been off her Klonopin and was weaning off Seroquel because of its intolerable side effects. *Id.*

In focusing on the periods in which Plaintiff was feeling good, the ALJ did not consider her two hospitalizations, totaling fourteen (14) days inpatient, due to suicidal ideations in 2016. Furthermore, Dr. Cunningham observed that "[i]t is not unlikely that the client will attempt to appear calm and aloof on the surface, if not pleasant, despite her underlying tension and emotional dysphoria." AR at 1292. The ALJ also treated Plaintiff's participation in a meeting with her treatment team for an annual behavioral health review as evidence that she is not disabled. *Id.* at 50. Review of Plaintiff's medical records demonstrate that her mental health follows a trajectory of highs and lows. The Ninth Circuit Court of Appeals "ha[s] emphasized [that] while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). Furthermore, "[c]ycles of improvement and debilitating symptoms are common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated

instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.* (citations omitted).

### b. Activities of daily living

The ALJ stated, in relevant part:

> I also find it significant that she reported engaging in activities inconsistent with allegations of severity. For instance, she reported that she going [sic] to a local mountain spot to attend a family reunion (Exhibit 6F at 25, July 2014); she reported going out to have fun to help with her depression (Exhibit 8F at 15, November 2014). Additionally in late January 2015 the claimant attended an annual behavior health review at SEABHS. Exhibit 9F at 1–5. With respect to her progress, her providers documented that the claimant had made improvements the last three months. Exhibit 9F at 2. She was going on walks, cleaning her house, reading books, was more energized and less depressed. Id. She also reported having a close relationship with her boyfriend. Id. at 3.

AR at 50. The ALJ also focused on Plaintiff's ability to go to appointments, go grocery shopping, occasionally walk, complete all activities of daily living independently, and use a computer. *Id.* at 50, 55.

The Ninth Circuit Court of Appeals has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has explained:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). Although a Plaintiff may be able to manage living on her own and getting out on a daily basis, this does not necessarily equate with the ability to work. *Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed). Furthermore, "[o]ccasional symptom-free periods . . . are not inconsistent with disability, . . . and an ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 679 (9th Cir. 2017).

The ALJ's focus on two (2) social outings in three years is contrary to Ninth Circuit authority. Review of the medical records does not support a finding that Plaintiff's activities undermine her symptom claims. For example, Plaintiff testified that her boyfriend drives her everywhere, which he confirmed. The Court finds Plaintiff's ability to feed and water her cat or sit on her couch and peruse Facebook does not support a finding that she is capable of working.

### c. DID Diagnosis

The ALJ noted that Plaintiff's emergency room providers voiced uncertainty regarding her DID diagnosis. AR at 52. The ALJ also noted NP Ekman's "expressed uncertainty regarding her DID diagnosis." *Id.* It is the treating providers responsibility to diagnose a Plaintiff. As NP Herrier observed, Plaintiff "tends to minimize mood symptoms and has a specific view of her diagnosis." *Id.* at 936. This view was confirmed by NP Ekman's observation that Plaintiff "still speaks in diagnosis by mentioning her PTSD and DID rather than specific symptoms." *Id.* at 1019. Plaintiff's attachment to a particular diagnosis does nothing to minimize the symptoms she claims to suffer. This is not clear and convincing evidence to discount Plaintiff's symptom testimony.

### d. Contemplation of work

The ALJ construed Plaintiff's contemplation of returning to work as suggesting that her symptoms and limitations were not as severe as alleged. AR at 52–53. Plaintiff expressed frustration at the fact of her mental illness, the slow progress of treatment, and

the realization that treatment is non-linear.  *See id.* at 789, 835, 957, 1257, 1259, 1264.  It is to be expected that when she was feeling better, she would believe that she was capable of going back to work, and when she was depressed, envisioned qualifying for disability benefits.  Such is the nature of her disease.  The ALJ committed legal error in failing to recognize the impact of her illness on her goals.

### e.  Conclusion

Based upon the foregoing, the Court finds that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which are supported by substantial evidence in the record.  *See Lingenfelter*, 504 F.3d at 1036; *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

### C.  *Therapist Trujillo*

The ALJ gave Mr. Trujillo's opinions little weight, asserting that "[t]he limitations assessed by Mr. Trujillo are not consistent with objective findings and not consistent with the claimant's reported activities."  AR at 55.  The ALJ further states that "[a]s described previously, many of the claimant's providers, including Dr. Cunningham, Mr. Ekman, and emergency room hospital providers, documented that claimant's memory was intact, she appeared anxious but cooperative and pleasant, she had good grooming and hygiene, her thought processes were usually goal directed and logical though occasionally tangential, and her mood and affect ranged from depressed to euthymic."  *Id.*  The ALJ also points to Plaintiff's activities of daily living as a reason for discounting Mr. Trujillo's opinion.  *Id.*

Ninth Circuit "precedents require that the ALJ provide 'germane reasons' to reject [Mr. Trujillo's] opinions.  *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017) (citations omitted).  The Court is unconvinced that good grooming and hygiene while Plaintiff is undergoing inpatient treatment for being suicidal is a germane reason for discounting Mr. Trujillo's testimony.  The Court has found that the ALJ committed legal error in his determinations regarding the severity of Plaintiff's symptoms, as well as the veracity of Plaintiff's descriptions of those symptoms including her activities of daily living.  *See* Section III.B.2.a. & b., *supra*.  As such, "[t]he ALJ failed to provide 'germane reasons'" to

discount Mr. Trujillo's opinion testimony. *Popa*, 872 F.3d at 907.

### D. Examining Physician

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). Similarly, "[t]he opinion of an examining physician is, in turn, entitled to greater weight that the opinion of a nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citations omitted). "As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Id.* (citations omitted). Furthermore, "like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31 (citations omitted). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(c)(4). Additionally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (citations omitted); *Buck v. Berryhill,* 869 F.3d 1040, 1050 (9th Cir. 2017). Furthermore, the Ninth Circuit Court of Appeals has acknowledged:

[T]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology. . . . Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. *See Poulin [v. Bowen]*, 817 F.2d [865,] 873 [(D.C. Cir. 1987)] ("Unlike a broken arm, a mind cannot be x-rayed."). Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness.

*Buck v. Berryhill,* 869 F.3d 1040, 1049 (9th Cir. 2017).

The ALJ gave some, but not great weight to examining physician Dr. Cunningham's opinion. AR at 54. As an initial matter, he found it unclear as to whether Dr. Cunningham's definitions of "moderate" and "severe" match those of Social Security. *Id.* The ALJ also indicated his belief "that the objective evidence is inconsistent with Dr. Cunningham's opinion that the claimant has severe limitation." *Id.* The Court has found that the ALJ committed legal error in his determinations regarding the severity of Plaintiff's symptoms, as well as the veracity of Plaintiff's descriptions of those symptoms including her activities of daily living. *See* Section III.B.2.a. & b., *supra*. Moreover, contrary to the ALJ's belief, Dr. Cunningham's opinion is consistent with the medical record as a whole. As such, the ALJ committed legal error in rejecting Dr. Cunningham's opinion testimony.

### E.    Remand

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. §405(g). "'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

(1) the ALJ failed to provide legally sufficient reasons for rejecting the

evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting Plaintiff's symptom testimony, assessing the severity of her mental illness, discounting examining physician testimony, and discounting other source testimony. "Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). The Court finds that the record is well developed and no outstanding issues must be resolved before a determination of benefits can be made. The Court further finds that it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence properly credited.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

## IV.    CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 18) is GRANTED;

2)    The Commissioner's decision is REVERSED and REMANDED for calculation and award of benefits.  42 U.S.C. § 405(g); and

3)    The Clerk of the Court shall enter judgment, and close its file in this matter.


Dated this 27th day of September, 2019.

Honorable Bruce G. Macdonald
United States Magistrate Judge